STATE OF MARYLAND, to Use of BODDIE, v. BALTIMORE & O. R. CO. et al.

(District Court, D. Maryland. December 24, 1918.)

SHIPPING ☞84(1)—ACTION FOR WRONGFUL DEATH—NEGLIGENCE.

A dredge, stationed in a slip and made fast to piers by two lines on each side, which allowed the second line to sag while a launch loaded with stevedores was passing out under them, by which a stevedore was swept off and drowned, *held* in fault and liable for the death; it appearing that the launch signaled her start, and that if the lines had been held taut, as customary, she could have passed under safely, but that through negligence of the lookout on the dredge she was neither heard nor seen.

In Admiralty. Suit by the State of Maryland, to the use of Louise Boddie, widow of William Boddie, deceased, against the Baltimore & Ohio Railroad Company, the Maryland Dredging & Contracting Company, the Patapsco Ship Ceiling & Stevedore Company, and the Empire Engineering Company, Incorporated. Decree for libelant against the Maryland Dredging & Contracting Company.

Benjamin H. McKindless and Charles W. Main, both of Baltimore, Md., for libelants.

Charles R. Webber and Duncan K. Brent, both of Baltimore, Md., for respondent Baltimore & O. R. Co.

Joseph N. Ulman and George Forbes, both of Baltimore, Md., for respondent Maryland Dredging & Contracting Co.

Marbury, Gosnell & Williams, Frank Gosnell, and Jesse Slingluff, all of Baltimore, Md., for respondent Patapsco Ship Ceiling & Stevedore Co.

William Fell Johnson, Jr., of Baltimore, Md., for respondent Empire Engineering Co., Inc.

ROSE, District Judge. The equitable libelant seeks compensation for her husband's death. There is no dispute as to how he was killed, and upon the facts there can be none that it was the result of the negligence of some one other than himself. The controversy is as to whose carelessness it was. He was in the employ of the respondent the Patapsco Ship Ceiling & Stevedore Company, hereinafter called the "Stevedore Company." It had frequent occasion to move its workmen about the harbor, and for that purpose, it sometimes used launches of its own, and sometimes hired those of others. At the time of the fatal accident, the deceased was in one of the latter, upon which the gang, of which he was a member, had been ordered by the Stevedore Company. The launch attempted to pass under the lines which held fast to the pier a dredge which was owned and operated by the respondent the Maryland Dredging & Contracting Company, hereinafter called the "Dredging Company." One of these lines sagged down upon the launch, and swept the deceased off to his death by drowning.

The dredge had been working in the same slip for something over three weeks before the accident. The launch had passed in and out of the slip almost daily, and usually a number of times each day. During working hours, the dredge was made fast to the piers, on either side, by lines; there being two of them on each side. One of these the breast line, ran from amidship the dredge to the pier. It was about 80 feet long. The other extended from the dredge's quarter diagonally forward about 200 feet to the pier. When these lines were taut, there was ample room for a launch safely to pass under them. When the dredge was at work, as the result of the movements of its bucket, the lines were continually passing from taut to slack, and back again. About three-quarters of a minute elapsed from one slackening of the line until the next. The accident happened on an August morning. The launch started from the head of the slip; that is, from a point 200 or 300 feet from the dredge. The starboard side of the dredge was that upon which the launch should have gone, if upon any, and upon that side it attempted to pass. At the time it started, the dredge's starboard lines were both taut, and remained so until after the launch had passed under the first, presumably the breast line. Then the other line sagged down on the launch and swept the deceased off.

There are only two controverted questions of fact: (1) Did the launch sound its whistle as it left the wharf? and (2) was the dredge at work when the launch started towards it?

It is abundantly established that the whistle was at hand. There was no reason why it should not have been sounded, and every reason why it should. The master of the launch and two other persons swear positively that it was. Seven other persons who testified were, at the time, in a position in which it was physically possible for them to have heard the blast, if given. Of these, two do not remember whether the whistle was sounded or not. A third, a very intelligent man, states that, had it been blown before the launch started, his attention would hardly have been attracted to it. Of the remaining four, two were the master and engineer of the dredge. Their evidence that it was not sounded is of little worth.

The captain is quite deaf, and says he has been increasingly so for the last 10 years. He claims that he can hear better when the dredge is vibrating than he can at other times. However that may be, his evidence that he did not hear the whistle proves nothing, in spite of the fact that he appeared to be, outside of the defect in his hearing, a competent and truthful man. He was in the pilot house looking forward at the time of the accident, and he did not rely on his own ears for knowledge as to signals which might be given by boats coming up from the rear of the dredge. In the absence of his mate, he had stationed his engineer on the stern, at a point from which all that went on aft his boat could have easily been seen, and from which there were ample facilities for communicating promptly with him. All these precautions were bound to prove useless, unless the engineer in fact did keep his eyes and his ears open. It never seems to have occurred to him that there was any reason why he should do either. Apparently he supposed that he had nothing whatever to do, except once in every 20 minutes or so, at which interval it was customary to move the dredge. He says he did not hear the whistle, but then he was equally deaf to the noise made by somewhere from 20 to 40 stevedores crowding upon the launch. He never saw the launch at all, until it was under the line which caused the disaster. From his whole manner on the stand, I concluded that he was either physically or mentally asleep for some while before the accident. When testifying, he was voluble in his criticisms of the actions of the launch on previous occasions, and as to the warnings given it by the dredge captain, and as to its speed at the time of the accident. A comparison between what he says on these matters and the testimony of the dredge master shows that many of his statements are gross and obvious exaggerations, to call them by no harsher term.

The remaining witnesses, who say that the whistle was not sounded, are a colored stevedore and a very intelligent launch captain, then in the employ of the Stevedore Company, but now in the government service. He was standing on a wharf near by at the time the launch put out. Both these witnesses made a favorable impression, and yet such negative testimony, even when given by honest and capable men, is not persuasive against the positive testimony of witnesses who appear also to be trying to tell the truth. Neither of these men was charged with any duty which depended upon his hearing the whistle. It might well have been sounded without its making the slightest impression on either of them. Under such circumstances, all of us have ears, but we hear not. It is, of course, not possible to be absolutely certain that the whistle was sounded; but I have little doubt that it was, and must so find. That being so, the dredge was clearly in fault. It could have suspended its operations long enough to allow the safe passage of the launch, as had been its habitual practice with reference to this and other launches. If, for any reason, it was at the moment impracticable to stop, the engineer could, as was also usual, have signaled the launch with his hands to wait. Neither was done, because for some reason the engineer was for the moment oblivious to all that was going on about him, and the captain of the dredge, handicapped

by his defective hearing, relied on his engineer for information as to what was happening to the stern of his boat.

In view of this conclusion, it is unnecessary to determine the other point in controversy, namely: Was the dredge at work when the launch started towards it? There are many witnesses, and not all from one side, who are positive that it was, and had been for some hours before. Those who claim that it was not point out that every one agrees that the dredge's starboard lines were taut when the launch left the wharf, and remained so until after the launch had successfully passed under the first of them. The launch was not, even at the time of the accident, moving more than three knots an hour. It is argued that, had there not been some stoppage of the dredge, the lines would not have been taut so long. The calculation is a close one, but it is not necessary to make it.

It must be remembered that the owner of the launch is not a party to this cause. If he were, it would be necessary to give much consideration to the contention that the master of the launch was in fault for not making sure that his signal had been heard and understood by the dredge; but, if so much be granted, it would not exonerate the dredge, but it would merely inculpate the launch also. The libelant may hold either or both responsible. In point of fact, the launch owner was not sued, very possibly because the prospect of being able to collect a large sum of money from him was not thought to be hopeful. Any one of the respondents could have brought the launch owner in. No one of them has done so. If the Dredging Company thinks it worth while, it may, after paying the decree, seek contribution from him, unless the expiration of the period of limitation prescribed by the Maryland form of Lord Campbell's Act will prevent.

The Stevedore Company does not appear to be liable for the negligence of the master of the launch. It is true that its general foreman, who, under all the circumstances, bore to the deceased the relation of vice principal, and not fellow servant, ordered the men into the launch. It is possible, if the accident had been the result of overcrowding the boat, or of its unseaworthiness, the Stevedore Company might have been liable, because it had told its workmen to take passage in it; but it is certainly not answerable for unanticipated negligence in the management of a launch, which it did not own, and whose master was not selected by it. It follows that, as to the Stevedore Company, the libel must be dismissed.

The Baltimore & Ohio Railroad Company owns the piers on either side of the slip. It engaged the Empire Engineering Company to have the slip dredged out, and the latter employed the Dredging Company to do the actual work. The Railroad Company and the Engineering Company were sued, I suppose, upon the theory that the work to be done was of such a character, or was to be done in such a place, that the defense of independent contractor is not open to them as against the claim of one who has suffered injury in the course of its doing. It does not seem that, under the facts in evidence, the doctrine is applicable; but it will probably be unnecessary to pass upon that question. If they, or either of them, could be held liable, it would be be-

cause, and only because, they, or one of them, was answerable for the negligence of the employés of the Dredging Company, and the latter would be bound to reimburse them for whatever they were called upon to pay in consequence of such negligence. Fortunately it is abundantly solvent, and the question of whether the Railroad Company or the Engineering Company is under any liability to libelant may be postponed until after the libelant has failed to collect its decree from the Dredging Company.

The deceased was a young man in good health, making at the time of his death from $22 to $25 a week. These wages are about double what, before the war, stevedores used to receive at this port; but, according to the official index numbers, prices have gone up on an average in about the same degree, or the purchasing power of a dollar is only one-half of what it was—whichever way you choose to put it. This state of facts may not be permanent; probably to its full extent it will not be. Taking all things into account, I think a reasonable award is $7,500, and for that amount a decree will be given against the Dredging Company, the question of the possible liability of the Railroad and the Engineering Company, respectively, being reserved.